UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ROBERT METCALF,

              Plaintiff,

    v.

BLUE CROSS BLUE SHIELD OF
MICHIGAN, a Michigan Corporation;
DAIMLER TRUCKS NORTH AMERICA,
LLC, a Delaware Corporation; and DAIMLER
TRUCKS NORTH AMERICA LLC GROUP
HEALTH PLAN,

              Defendants.

Case No. 3:14-cv-302-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## **INTRODUCTION**

This is the second case filed by plaintiff, Robert Metcalf, a chiropractor, alleging claims

under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 USC §§ 1001-

1461, to recover benefits for medical services that he provided to individual participants in the

defendant Daimler Trucks North America LLC Group Health Plan ("Plan").  In the prior and still

pending case, *Metcalf v. Blue Cross Blue Shield of Mich.*, Case No. 3:11-cv-1305-ST ( *"Metcalf*

*I"*), Metcalf, as an assignee, seeks to recover benefits due to 123 participants for services

1 - FINDINGS AND RECOMMENDATION

performed over a 21-month period between May 15, 2008, and February 18, 2010.  As discussed in the Opinion and Order dated August 5, 2013 (docket # 82) in that case, the parties strenuously disagree as to whether Metcalf is entitled to recover benefits which defendants have already paid to the Plan's participants after receiving notice of assignments by the participants to Metcalf. Acknowledging the novelty of this issue, this court granted summary judgment in favor of Metcalf as to liability.  Hoping to quickly reverse this court's decision on appeal, defendants filed a Motion for Certification for Interlocutory Appeal which this court denied (docket #94). Discovery is proceeding in *Metcalf I* as to the amount of benefits due.

Convinced that this court reached the wrong decision in *Metcalf I*, defendants continue to disregard the assignments from the participants to Metcalf and pay benefits to the participants, rather than directly to Metcalf.  Based on defendants' opposition, this court denied plaintiff's Motion for Leave to File Amended Complaint (docket #99) in *Metcalf I* to include additional current and future claims.  Although this court encouraged the parties to enter into an agreement to toll the statute of limitations, they were unable to do so.  To avoid a statute of limitations problem with respect to those accruing claims, Metcalf filed this second lawsuit.  This court has jurisdiction pursuant to 28 USC § 1331 and 29 USC § 1132.

Defendants have filed a Motion to Dismiss (docket #11) for failure to state a claim.[1]  For the following reasons, that motion should be granted as to Claim 3 and otherwise denied.

## STANDARDS

In evaluating a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6), the court must accept the allegations of material fact as true, and must construe those allegations in the light most favorable to the non-moving party.  *Ass'n for L.A. Deputy Sheriffs v. Cnty. of*

---

[1] Not surprisingly, in contrast to *Metcalf I*, this case lacks consent by all parties to a Magistrate Judge.

*L.A.*, 648 F3d 986, 991 (9th Cir 2011), *cert. denied*, 2012 WL 170538 (2012).  "A complaint must not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief."  *Aguayo v. U.S. Bank*, 653 F3d 912, 917 (9th Cir 2011) (citation omitted), *cert. denied*, 133 S Ct 106 (2012).  Although detailed factual allegations are not necessary,

> a plaintiff's obligation to provide the "grounds" of his
> "entitle[ment] to relief" requires more than labels and conclusions
> and formulaic recitation of the elements of a cause of action will
> not do.  Factual allegations must be enough to raise a right to relief
> above the speculative level, on the assumption that all the
> allegations in the complaint are true (even if doubtful in fact).

*Bell Atlantic Corp. v. Twombly*, 550 US 544, 555-56 (2007) (citations omitted and alteration in original).

Generally, FRCP 12(b)(6) does not permit a court to consider evidence beyond the pleadings.  If matters outside the pleadings are presented to and not excluded by the court, then a motion under FRCP 12(b)(6) must be treated as one for summary judgment.  FRCP 12(d).  However, where the complaint refers to a document central to the claim and the authenticity of which is not challenged, then the document is considered part of the pleading for purposes of FRCP 12(b)(6) and (d).  *Marder v. Lopez*, 450 F3d 445, 448 (9th Cir 2006) (citations omitted).  Even if the complaint does not specifically refer to the document offered with the FRCP 12(b)(6) motion, documents are not outside the complaint if the "complaint necessarily relies" on them or alleges the contents.  *Coto Settlement v. Eisenberg*, 593 F3d 1031, 1038 (9th Cir 2010) (citing cases extending the incorporation by reference doctrine).

In support of its motion, defendants have submitted the Declaration of Larry Abbiatti (docket #13) that includes the Plan's Handbook ("Handbook") (Ex. A) and Summary Plan Description ("SPD") (Ex. B).  Given that the parties do not dispute the authenticity of these

3 - FINDINGS AND RECOMMENDATION

documents and the applicability of their terms to the issues raised by the Complaint, the court will consider them in resolving this motion.

The court will also consider matters of public record filed in *Metcalf I* because they are subject to judicial notice.

## ALLEGATIONS

The allegations in the Complaint in this case are very similar to the allegations in *Metcalf I*, with some additions and clarifications.

The Plan is a health benefits plan subject to ERISA.  Complaint, ¶ 1.4.  Defendant Daimler Trucks North America LLC ("DTNA"), the employer, is the Plan Sponsor and Plan Administrator and makes all payments for benefits owed under the Plan.  *Id*, ¶¶ 1.6-1.9, 2.2, 2.4. Defendant Blue Cross Blue Shield of Michigan ("BCBSM") is the Claims Administrator and issues decisions on claims for benefits submitted to the Plan.  *Id*, ¶¶ 1.10-1.12, 2.2-2.3.

Metcalf, a chiropractor who has been practicing in North Carolina for 12 years, regularly treats Plan participants.  *Id*, ¶¶ 2.20-2.21.  On May 1, 2008, Metcalf switched from being a network provider for the Plan to being a non-participating provider.  *Id*, ¶ 2.22.

For each patient who participated in the Plan, Metcalf obtained two forms:  (1) an Insurance Assignment and Release ("Assignment"); and (2) a Designation of Authorized Representative ("Designation").  *Id*, ¶ 2.23.  "Under the Assignment, each patient assigned directly to [Metcalf] all insurance benefits otherwise payable to the patient for services rendered by [Metcalf], and permitted [Metcalf] to use the patient's health care information to [*sic*] BCBSM for purposes of obtaining payment for services and determining insurance benefits payment for related services."  *Id*, ¶ 2.24.  "Under the Designation, each patient designated [Metcalf], to the full extent permissible under ERISA, to otherwise act on the patient's behalf to

pursue claims and exercise all rights connected with the [Plan], with respect to any medical or

other health care expenses incurred as a result of the services the patient received from

[Metcalf]." *Id*, ¶ 2.25.

Periodically, Metcalf submitted Claim Forms to BCBSM for services rendered to Plan

participants who had executed these Assignments and Designations. *Id*, ¶¶ 2.26, 2.29. Metcalf

put BCBSM on notice that he possessed an Assignment and Designation for each patient with

every Claim Form he submitted on behalf of that patient by noting "SIGNATURE ON FILE" in

Boxes 13 and 12, respectively. *Id*, ¶¶ 2.27-2.30. Metcalf also put BCBSM and DTNA on notice

in December 2008 that he possessed Assignments for all of his patients who participated in the

Plan through a letter. *Id*, ¶ 2.34. Metcalf also put BCBSM on notice that he was participating in

the Plan on a per-claim basis with each and every Claim Form he submitted by noting "YES" to

the question "ACCEPT ASSIGNMENT?" in Box 27. *Id*, ¶¶ 2.31-2.33.

After November 1, 2008, defendants failed to pay Metcalf directly for the claims that he

had submitted for services rendered to Plan participants, despite the fact that he possessed

Assignments and Designations for these participants and had notified defendants of that fact. *Id*,

¶ 2.35. Instead, defendants either paid his patients or entirely failed to pay *either* Metcalf or his

patients. *Id*, ¶ 2.36. Some patients have paid Metcalf with some of the money paid by

defendants, but this represents only a small fraction of what defendants owe Metcalf. *Id*, ¶ 2.39.

Concurrently, defendants failed to provide Metcalf with any documentation or notice of their

benefits decisions ("Explanations of Benefits" or "EOB"), despite his status as his patients'

assignee-beneficiary, claimant, and per-claim participating provider. *Id*, ¶ 2.40.

As the assignee for various Plan participants, Metcalf pursued multiple administrative

appeals, seeking both payment for services he rendered, as well as EOBs for the claims for those

services.  *Id*, ¶¶ 2.46-2.66.  BCBSM rejected Metcalf's appeals, claiming that the Plan prohibits

the assignment of any rights, and refused to treat Metcalf as either an assignee or a provider

participating on a per-claim basis.  *Id*, ¶¶ 2.49, 2.60, 2.66.  However, the Plan contains no such

anti-assignment provision.  *Id*, ¶¶ 2.51, 2.61.  Because any further efforts to pursue those

appeals, as well as similar appeals, were futile, Metcalf is permitted to file this lawsuit without

having pursued an administrative appeal of the claims at issue.  *Id*, ¶ 2.68.

      The claims at issue are those submitted by Metcalf and not paid directly to him by

defendants for:  (1) 123 patients in *Metcalf I* who are not the subject of cross-Motions for

Summary Judgment in *Metcalf I*, including any ongoing claims (Appendix A); and (2) 137

additional patients, including any ongoing claims (Appendix B).  *Id*, ¶¶ 2.69-2.70.

      As a result, Metcalf alleges two claims against defendants for violating ERISA:

(1) violation of § 502(a)(1)(B) by denying claims for benefits (Claim 1); and (2) violation of

§ 502(a)(3) by failing to comply with a requirement to conduct a full and fair review of the

alleged benefit claims (Claim 2).  To the extent that his first two claims are not governed by

ERISA, he alleges the alternative claims of breach of contract (Claim 3) and tortious interference

with business relations (Claim 4).  At the hearing on the motion, Metcalf withdrew Claim 4

(docket #22).

## FINDINGS

## I.    Lack of Standing (Claims 1 and 2)

      Defendants first argue that Metcalf has no standing as an assignee to pursue ERISA

claims to recover benefits which the Plan has already paid to his patients.  This is the crux of the

parties' dispute in *Metcalf I*.  In essence, defendants are asking this court to reconsider its ruling

adverse to them in *Metcalf I*.  Although the arguments are much better presented here than in *Metcalf I*, this court is unmoved.

ERISA allows civil actions to be brought "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 USC § 1132(a)(1)(B).  In addition, "a participant, beneficiary, or fiduciary" may bring a civil action "(A) to enjoin any act or practice which violates [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan."  29 USC § 1132(a)(3).  Such actions may also be brought by health care providers to whom a plan participant has assigned his or her rights.  *Misic v. Bldg. Serv. Emps. Health & Welfare Trust*, 789 F2d 1374, 1377-78 (9th Cir 1986).  However, an assignee's standing is limited to the scope of the assignment, and the assignee's claims are limited to those that the Plan participants could bring themselves.  *Eden Surgical Ctr. v. B. Braun Med., Inc.*, 420 F App'x 696, 697 (9th Cir 2011) (dismissing plaintiff's claims for penalties as beyond scope of assignment language).

By way of background, ERISA is silent with respect to assignment of health care benefits.  In light of this silence, those courts addressing the issue have held that Congress did not intend to preclude assignments of health care benefits, rights or causes of action.  *See, e.g.*, *Davidowitz v. Delta Dental Plan of Cal., Inc.*, 946 F2d 1476, 1478 (9th Cir 1991); *Lutheran Med. Ctr. v. Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan*, 25 F3d 616, 619 (8th Cir 1994), *abrogated on other grounds by Martin v. Ark. Blue Cross & Blue Shield*, 299 F3d 966 (8th Cir 2002); *St. Francis Reg'l Med. Ctr. v. Blue Cross & Blue Shield, Inc.*, 49 F3d 1460, 1464 (10th Cir 1995).  The issue of assignability is left to the discretion of the contracting parties.  *See,*

*e.g.*, *Davidowitz*, 946 F2d at 1481 (emphasis in original) (holding that "Congress intended *not* to

mandate assignability, but intended instead to allow the free marketplace to work out such

competitive, cost effective, medical expense reducing structures as might evolve"); *St. Francis*

*Reg'l Med. Ctr.*, 49 F3d at 1464.  Accordingly, plans may contain anti-assignment clauses in

order to constrain the costs of health care.  As explained by one court:

> Under a typical arrangement, the insurer makes direct payment to health
> care providers that participate in the insurer's health plan, but direct
> payment to non-participating providers is at the discretion of the insurer.
> The benefit of this system is that the insurer is able to impose cost
> constraints on the participating health care providers, in return for which
> the provider receives quick, certain and direct payment from the insurer.
> This system also provides an incentive to non-participating providers to
> join the plan.  However, "[i]f a patient could obtain care from a non-
> participating hospital and assign it the patient's right to be reimbursed
> under a group policy, in the teeth of an anti-assignment clause, this direct
> payment inducement . . . would be weakened or eliminated."

*Renfrew Ctr. v. Blue Cross & Blue Shield, Inc.*, No. 94-CV-1527 (RSP/GJD), 1997 WL 204309,

at * 3-4 (NDNY April 10, 1997), citing and quoting *Washington Hosp. Ctr. Corp. v. Group*

*Hospitalization & Med. Servs. Inc.*, 758 F Supp 750, 753-54 (DDC 1991).

The Plan at issue here does not contain an anti-assignment clause.  As a result of that

omission, Metcalf contends that the Plan must honor the Assignments and Designations from his

patients as required by state law.  Defendants, on the other hand, seek to avoid paying benefits or

providing EOBs and other information to Metcalf, a non-participating provider.  Although

Metcalf may have had agreements with his patients, defendants contend that those agreements do

not obligate the Plan to pay benefits to Metcalf or provide him with information concerning

claims decision.  To that end, defendants make several related arguments as to why Metcalf lacks

standing as an assignee or designee to pursue the alleged violations of ERISA under either 29

USC § 1132(a)(1)(B) (Claim 1) or § 1132(a)(3) (Claim 2).

Case 3:14-cv-00302-ST    Document 24    Filed 08/27/14    Page 9 of 19

First, they argue that he is not a statutory beneficiary as that term is defined in ERISA, but is only an assignee whose status is limited by the scope of the alleged assignments from the Plan participants. A "participant" or "beneficiary" may sue to recover benefits due under an ERISA-qualified plan, and a "participant," "beneficiary" or "fiduciary" may bring actions for violations of an ERISA provision. 29 USC § 1132(a)(1)(B), (a)(3). ERISA defines a "beneficiary" as "a person designated by a participant . . . who is or may become entitled to a benefit thereunder." 29 USC § 1002(8). That definition is sufficiently broad to include a person such as Metcalf who has been designated by participants pursuant to the alleged Assignments and Designations to receive benefits and pursue claims. In any event, Metcalf claims well-established derivative standing based on his status as an assignee and designee, such that this is a distinction without a difference.

Second, defendants argue that Metcalf cannot establish his claims through the alleged Assignments and Designations that the Plan did not receive. Metcalf alleges that he notified the Plan that he had Assignments and Designations from his patients, but not that he communicated the terms of those Assignments and Designations to the Plan. However, as previously held in *Metcalf I*, a debtor must honor an assignment upon receiving notice of the assignment. To be bound by the Assignments, the Plan did not need to receive copies of the actual assignments, but only notice that they existed, and the information provided in the claim forms and letters to the Plan satisfied the notice requirement. Therefore, it is irrelevant whether Metcalf sent copies of the Assignments and Designations to the Plan. It must also be noted that defendants did receive copies of at least some of the Assignments and Designations both from Metcalf directly in 2008 and 2009 and from his counsel during litigation of *Metcalf I.*

9 - FINDINGS AND RECOMMENDATION

Defendants correctly note that Metcalf had only treated two of the patients listed in Appendix B at the time he gave the December 2008 notice. However, the allegations in the Complaint are sufficiently broad to include notice to the Plan of assignments for all patients based on the boxes marked on the Claim Forms.

Third, defendants argue that the Claim Forms alone are insufficient to support Metcalf's claims. By noting "SIGNATURE ON FILE" in boxes 12 and 13 on the Claim Forms, each patient agreed to "authorize the release of any medical or other information necessary to process this claim" and "authorize payment of medical benefits to the undersigned physician or supplier for services described below." Complaint, ¶¶ 2.27-2.30. Defendants interpret that authorization merely as a permissive grant, not a mandate, to the Plan to exercise its discretion to pay Metcalf, a non-participating provider. This argument mischaracterizes Metcalf's claim. Metcalf does not allege that the Claim Forms contain the Assignments and Designations, but only that they provided notice of their existence. Moreover, Metcalf also alleges that in December 2008 he "notified both BCBSM and DTNA in writing that he possessed Assignments on file for all of his patients who participated in the [Plan]." *Id*, ¶ 2.34.

Fourth, defendants contend that Metcalf has not established any duty owed by the Plan to pay him benefits directly or provide him with information either under the Plan terms, the Assignments, or the Designations. They point out that the Plan states that network providers and participating providers are paid directly, but contains no similar requirement to pay non-participating providers, such as Metcalf. Instead it instructs participants that they "are usually required to pay [non-participating] providers directly" and then to "submit the claim to BCBS for reimbursement" which "may be less than the amount [the] provider charged." Abbiatti Decl., Ex. A., p. 20. Without a contract with the Plan as a network or participating provider, defendants

contest any obligation to deal with him directly.  However, based on its plain language, the Plan

does not bar direct payments to non-participating providers if so directed by the participants

through their Assignments.  Also, Metcalf alleges that he became a "per-claim" participating

provider by virtue of checking Box 27 on the Claim Forms.  Complaint, ¶¶ 2.31-2.33.  Although

the Booklet discusses "participating on a 'per[-]claim' basis" in the section describing non-

participating providers, it does not define a per-claim participant as a non-participating provider,

leaving open the proper interpretation of the Plan.  Abbiatti Decl., Ex. A, p. 20.  As discussed

below, this language does not create any contract between Metcalf and the Plan, and defendants

may well prevail as to their interpretation of the language.  However, resolution of this issue

must await a determination on the merits.  In any event,  Metcalf's claims are based not only on

the terms of the Plan, but also on the law governing ERISA plans.

Fifth, Defendants contend that the Assignments do not contain a clear intent to transfer

rights from the participants to Metcalf.  However, at this stage, the court must accept as true

Metcalf's allegations as to the scope of the Assignments which assigned to him "all insurance

benefits, if any, otherwise payable to the patient for services rendered by [him]" and the scope of

the Designations which designated him to "act on the patient's behalf to pursue claims and

exercise all rights connected with the Group Health Plan."  Complaint, ¶ 2.24.  This alleged

scope is sufficiently broad to evidence a clear intent by the patients to transfer all of their

benefits, claims, and rights under the Plan to Metcalf.

At the hearing on the motion, defendants refined their argument further.  Even if the Plan

mistakenly paid benefits to the participants, instead of paying them to Metcalf as required by the

Assignments, defendants contend that ERISA provides no remedy to Metcalf.  In the absence of

statutory guidance, courts should develop federal common law regarding ERISA rights.  *Pilot*

*Life Ins. Co. v. Dedeaux*, 481 US 41, 56 (1987) (Congress "expect[ed] that a federal common

law of rights and obligations under ERISA-regulated plans would develop").  "In developing a

federal common law to govern ERISA suits, federal courts may borrow from state law where

appropriate, and be guided by the policies expressed in ERISA and other federal labor laws."

*Babikian v. Paul Revere Life Ins. Co.*, 63 F3d 837, 840 (9th Cir 1995) (citation and internal

quotations omitted).  Because the assignment of a contractual right is generally governed by state

law, in *Metcalf I* this court turned to state law (North Carolina and Oregon) regarding

assignments as guidance to determine what claims Metcalf can bring under ERISA as an

assignee.[2]

Defendants urge this court to reject state law regarding assignments and conclude that

ERISA only permits participants to assign their unpaid benefits, not paid benefits, to providers

such as Metcalf.  In support, they cite *Eden Surgical Ctr.*, 420 F App'x 696, holding that a health

care provider, as the assignee of the plan participants, lacked derivative standing to sue to collect

statutory penalties from plan administrators.  In his dissent, Judge Bybee noted that under

California law, the assignee held "the exclusive rights to sue on the assigned claims."  *Id* at 697

(citation omitted).  He chastised the majority for "essentially ignor[ing] both the broad and

express assignment language" and holding that language in one section deprived the assignee of

standing.  *Id* at 698.  By rejecting Judge Bybee's dissent, defendants argue that the majority of

the court rejected the application of state law governing assignments.  However, the majority did

not discuss the role of state law, but merely relied on specific language of the assignment to

exclude the alleged claim.  Nothing in that decision assists defendants.

---

[2]  Contrary to defendants' characterization, this court did not simply "adopt" state law, but looked to state law in order to advance the development of federal common law.

Defendants also cite *Hansen v Aetna Health & Life Ins. Co.*, No. Civ. 98-949-HA, 1999 WL 1074078 (D Or Nov. 4, 1999). In that case, a plan participant sued to recover unpaid medical benefits for care provided to her deceased spouse. The plan sought summary judgment asserting, among other arguments, that the plaintiff was no longer the real party in interest because she had assigned payment of medical benefits to a medical treatment facility. Citing *Cagle v. Bruner*, 112 F3d 1510, 1515 (11th Cir 1997), Judge Haggerty rejected "defendants' theory that only one entity can assert the rights that plaintiff seeks to exercise, and that plaintiff has given up that right through her assignment." *Id* at *6. Noting the lack of authority presented by defendants to support their theory, Judge Haggerty explained that:

> [s]uch a construction would contradict a primary objective of ERISA — enhancing employees' health and welfare benefit coverage. Holding that the creation of an assignee's right to sue derivatively would also deprive a participant or beneficiary of a plan the right to sue, accordingly, would thwart this congressional intent. If a participant's or beneficiary's status of assignor of benefits deprived them of standing, such assignments would be discouraged, and the risks of financial disruption and non-payment would be increased. Under defendants' theory, participants such as plaintiff, who paid the assignees for the care rendered after Aetna refused to do so, would suffer the hardship of lacking standing to enforce rights, and the assignees, who have been paid, would have no interest in incurring the cost of a derivative suit on the participants' behalf.

*Id* (citation omitted).

If both the assignor and assignee have standing to sue, as held by *Hansen* and *Cagle*, defendants reason that the assignment does not transfer all rights to the assignor, thus invalidating the assignment. But that reasoning is defective. Neither *Hansen* nor *Cagle* deal with the situation presented here. In *Hansen*, the assignor had paid the assignee for services rendered after the plan had denied coverage, eliminating the assignee's incentive to sue to recover benefits. In contrast here, Metcalf alleges that he has not been paid for services rendered to the assignors, except for "some of the money Defendants paid" to them "which is only a small

fraction of what Defendants owe." Complaint, ¶ 2.39.[3] Since he has allegedly agreed to accept payment under the terms of the Plan as full reimbursement, he, and not his assignors, has every incentive to sue to recover benefits.

*Cagle*, cited by *Hansen*, also is distinguishable. The father signed a form assigning to the hospital his son's right to payment of medical benefits. Later, the insurer refused to process any additional claims for the son unless the mother signed a standard subrogation form which she refused to do. When the insurer filed suit for declaratory and injunctive relief, both the mother and the hospital counterclaimed against the insurer for refusing to pay benefits. The insurer argued that if the hospital had standing as an assignee to sue, then the mother did not. Allowing the mother to challenge the subrogation agreement, *Cagle* did not find that the assignor's and assignee's "standing to be mutually exclusive, because [they] have distinct interests in this litigation." *Cagle*, 112 F3d at 1515. The hospital was concerned with being paid for its treatment of the son, while the mother's concern was the scope of the subrogation agreement which "is of little or no concern to [the hospital], which has no claim against any damages that may be recovered from a third party." *Id* at 1516. In contrast here, Metcalf, as the assignee, is pursuing his assignors' benefits, claims, and rights.

Furthermore, an assignment, in some cases, may deprive the assignor of her right to sue. *See Klamath–Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F2d 1276, 1283 (9th Cir 1983) (noting that "had the assignors sought to save their claims for later use," they would not have employed language effectuating a full assignment of all antitrust claims). A court's task in interpreting the scope of an assignment is to "enforce the intent of the parties." *Id*. Courts must look to the language of an ERISA assignment itself to determine the scope of the assigned

---

[3] Of course, to the extent that Metcalf has received payment from his patients/assignors for his services, he has no claim against defendants for that amount.

claims. *See Eden Surgical Ctr.*, 420 F App'x at 697.  Metcalf alleges that his patients assigned

everything to him: benefits, claims, and rights.  Complaint, ¶ 2.24-.2.25.  As noted by the Ninth

Circuit, such assignments by beneficiaries to their medical care providers may protect the

beneficiaries and further ERISA's underlying policies:

> Assignment of trust monies to health care providers results in precisely the
> benefit the trust is designed to provide and the statute is designed to
> protect.  Such assignments also protect beneficiaries by making it
> unnecessary for health care providers to evaluate the solvency of patients
> before commencing medical treatment, and by eliminating the necessity
> for beneficiaries to pay potentially large medical bills and await
> compensation from the plan.  Moreover, assignments permit a trust fund to
> obtain improved benefits for beneficiaries by bargaining with health care
> providers for better coverage and lower rates.

*Misic*, 789 F2d at 1377.

Accepting defendants' argument that the alleged Assignments are invalid because

Metcalf, as the assignee, does not have an exclusive right to sue would in essence negate *every*

assignment of health care benefits from participants to providers, contrary to ERISA policy.  For

the reasons stated in *Metcalf I*, the state law governing assignments permits Metcalf, as the

assignee, the necessary standing to pursue claims to recover unpaid (denied) benefits and for

benefits paid to the assignors (and not paid by the assignors to Metcalf) which failed to discharge

the Plan's obligation after the Plan was allegedly notified of the Assignments.  By ignoring the

Assignments on the mistaken belief that the Plan contained an anti-assignment provision,

defendants did not simply exercise their discretion, but allegedly violated state law and paid

benefits to the wrong persons, leaving benefits unpaid to the person entitled to them in violation

of the terms of the Plan.  Contrary to defendants' position, enforcing the Assignments does not

create a remedy under ERISA that does not exist.

Therefore, defendants' motion to dismiss Claims 1 and 2 should be denied.

15 - FINDINGS AND RECOMMENDATION

**II.**    **Lack of Contract (Claim 3)**

Claim 3 alleges that if Metcalf cannot pursue claims for benefits as an assignee of his patients, then BCBSM has breached its implied contract to pay him as a per-claim participating provider.  Defendants seek dismissal of Claim 3 because there is no contract or agreement between Metcalf and the Plan.

The Handbook describes three classifications of health providers:  network providers, out-of-network but participating providers, and non-participating providers.  Handbook, p. 19.  A network provider has a contract with the Plan, and a participating provider has a signed agreement with the Plan.  *Id*, pp. 19, 91.  Non-participating providers have no signed agreements with BCBS and "may or may not choose to accept the BCBS approved amount as payment in full" for health care services.  *Id*, p. 20; Complaint, ¶ 2.5.  Metcalf was a network provider until May 1, 2008.  *Id*, ¶ 2.22.  After that and during the time period at issue here, he was a non-participating provider.  *Id*.

The section of the Handbook describing non-participating providers includes a description of per-claim participation as a provider who "will accept the amount we approve as payment in full for the services you need."  Handbook, p. 20; Complaint, ¶ 2.7.  It provides no required method for non-participating providers to notify BCBSM when they choose to participate on a per-claim basis.  *Id*, ¶ 2.8.  It states only:  "If your present providers do not participate with BCBS, ask if they will accept the amount we approve as payment in full for the services you need.  This is called participating on a 'per[-]claim' basis and means that the providers will accept the approved amount as payment in full for the specific services."  Handbook, p. 20; Complaint, ¶ 2.6.

Metcalf alleges that he agreed to accept the approved amount as payment in full when he

checked "YES" to the question "ACCEPT ASSIGNMENT?" for Box 27 on the Claim Forms he sent to BCBSM. *Id*, ¶ 2.31. Thus, he became per-claim participating provider, notified defendants of that fact, and became entitled to all contractual rights owed to participating providers, including receipt of vouchers and direct payment of claims. *Id*, ¶¶ 2.32-2.33. By failing to provide him with those rights, he alleges that defendants committed a breach of contract. *Id*, ¶¶ 3.25-3.26.

The problem with this claim is that Metcalf's agreement to participate on a per-claim basis was with his patients, not with defendants. Reading the Plan as a whole, per-claim participation means only that a non-participating provider may agree with his patient to accept the amount approved by the Plan. There is no basis to support a claim that per-claim participation creates a contract between a non-participating provider, such as Metcalf, and the Plan and imposes obligations on the Plan in favor of the non-participating provider. In other words, Metcalf had no separate contract with any of the defendants that he can enforce. The plain meaning of the terms in the Plan precludes Metcalf's claim that he was a party to a contract with the Plan after he terminated his contract on May 1, 2008. Instead, any claim based on defendants' failure to pay Metcalf on a per-claim basis must be pursued by him under ERISA as an assignee of the Plan participants.

Accordingly, Claim 3 should be dismissed as an alternative claim with leave to replead as a separate ERISA violation.

III.    **Repleading**

Lastly, defendants argue that the Complaint should be dismissed for failure to state a claim under FRCP 12(b)(6) by not providing enough detail about the hundreds of alleged claims so that they can determine whether and how they failed to comply with any provision of the Plan.

Instead of identifying every claim, Metcalf alleges that he treated 260 patients at various times over more than eight years with unspecified conditions and that some unspecified number of claims in unspecified amounts were not paid.  Defendants urge this court to take the same approach with respect to multiple claims by an assignee as was taken in *Kindred Hosp. E. LLC, v. Blue Cross & Blue Shield*, Case No. 3:05-cv-995-J-32TEM, 2007 WL 601749, at *4-5 (MD Fla Feb. 16, 2007).  If Metcalf does not know what his claims are, defendants believe that it is improper for this court to provide a forum to reconcile the bookkeeping for his chiropractic clinic.

They made this same argument in *Metcalf I* which this court rejected.  This is quite a different situation than presented in *Kindred Hosp. E. LLC* which involved claims by participants in various employer insurance plans.  Metcalf's claims all arise out of a single Plan and have been preceded by administrative claims pursuant to the terms of that Plan which defendants have denied.  He does not challenge the amounts paid on isolated claims, but challenges every claim processed by defendants for the enumerated patients and date ranges based on one issue, namely defendants' decision to ignore the Assignments and pay the participants, rather than Metcalf, their assignee.  Metcalf identifies each Plan participant by name in the Appendices and lists the range of dates for services provided.  In addition, Metcalf presented the claims for payment to defendants.

The claims at issue are not new to defendants.  Defendants are the custodians of the administrative records of the Plan participants and have more detailed information than Metcalf concerning both the paid and unpaid claims.  Since they have processed and either paid or denied the claims, they are on notice of the specific factual basis for each claim and why benefits were not paid.

18 - FINDINGS AND RECOMMENDATION

Therefore, as in *Metcalf I*, no supplemental allegations are necessary to comply with the minimal requirements of FRCP 8 or 10.

## RECOMMENDATION

Accept the allegations of material fact as true and construing those allegations in the light most favorable to the plaintiff, defendants' Motion to Dismiss for Failure to State a Claim (docket # 11) should be GRANTED as to Claim 3 with leave to replead as a separate ERISA violation and otherwise DENIED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Monday, September 15, 2014.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED August 27, 2014.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

19 - FINDINGS AND RECOMMENDATION